**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

EMILY WHALEN,                                              :

                            Plaintiff,

           -against-                                   :

CITY OF NEW YORK; POLICE OFFICER ANTHONY
RUGGIERIO; POLICE OFFICER JOHN DOES 1-3      :

                       Defendants.

-------------------------------------------------------------------X

**FIRST AMENDEND COMPLAINT**

Jury Trial Demanded

21 Civ. 04116-MK

Plaintiff, EMILY WHALEN, by her attorney, MASAI I. LORD Esq., of LORD LAW GROUP PLLC, alleges upon knowledge as to himself and her own actions, and upon information and belief as to all other matters, as follows:

## NATURE OF ACTION

1. Plaintiff Emily Whalen ("Plaintiff" or "Ms. Whalen") was a victim of an unjustified, violent assault by Police Officer Anthony Ruggierio at the Queer Liberation For Black Lives March.  This violent assault is consistent with the NYPD's use of violent force and unlawful arrests to suppress the widespread protests after the death of George Floyd..  As a result of this violent attack, Ms. Whalen suffered immense pain and injuries that affected her for months.

2. Ms. Whalen brings this action for compensatory damages, punitive damages, and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of

her rights under the Constitution of the United States of America and the New

York State Constitution.

## JURISDICTION

3.  This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth,

    Fifth, Sixth and Fourteenth Amendments to the United States Constitution, as

    well as the New York State Constitution.  Jurisdiction is conferred upon this

    Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) because Plaintiff's claims arise

    under law of the United States and seek redress of the deprivation under color of

    state law of rights guaranteed by the United States Constitution.

## VENUE

4.  Venue is proper for the United States District Court for the Southern District of

    New York, pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), and 28 U.S.C. §

    1402(b), where Defendants reside and maintain their relevant places of business,

    and where the actions complained of herein occurred.


## JURY DEMAND

5.  Plaintiff Whalen respectfully demands a trial by jury of all issues in this matter

    pursuant to Fed. R. Civ. P. 38(b).

## THE PARTIES

6.      Plaintiff Emily Whalen a resident of the State of New York, county of

Kings.

7.     Defendant City of New York is a municipal corporation organized under the laws of the State of New York.  It operates the New York City Police Department ("NYPD"), a department or agency of defendant City of New York responsible for the appointment, training, supervision, promotion and discipline of police officers and supervisory police officers, including the individually named defendants herein.

8.     Defendant Police Officer Anthony Ruggiero, ("Officer Ruggiero") was at all times relevant to this Complaint a duly appointed and acting employee of the City of New York and the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the NYPD.  They are sued in their individual capacity.

9.     Defendant John Does 1-3 ("John Doe") was at all times relevant to this Complaint a duly appointed and acting employee of the City of New York and the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the NYPD.  They are sued in their individual capacity.

10.    That all acts and incidents complained of herein occurred in New York County, City, and State of New York.

11.    That within 90 days after the state law claim of assault and battery accrued, plaintiff served a Notice of Claim, in writing, sworn by the claimant, containing the name and post office address of the plaintiff and plaintiff's attorney, the nature of the claim, the time when, the place and the manner by which the claim arose,

the items of damage and the injuries claimed to have been sustained, to be served upon the defendants by delivering a copy thereof to the person designated by law as a person to whom such claims may be served.

12.     That plaintiff appeared for a hearing pursuant to § 50-H of the General Municipal Law on or about September 17, 2021.

13.     That the defendants have not adjusted, settled the claim since the Notice of Claim was served and it has exceeded 30 days.

14.     That this claim has been commenced and this action has been started within one year and ninety days after the accrual of the state law violation upon which the New York State law claims are based.

15.     That all conditions and requirements precedent to the commencement of this action have been complied with.

## STATEMENT OF FACTS COMMON TO ALL CLAIMS

16.     On June 28, 2020, Emily Whalen participated in the Queer Liberation for Black Lives March.

17.     The march was organized to protest police brutality and racist violence against Black Americans as well as commemorating the 50th anniversary of the historic Stonewall riots.

18.     Plaintiff and the group she was marching with, SAGE, met up at around 12:00 pm to check in and go over security and safety protocols.

19.      At around 1:00 pm, SAGE met up and joined the larger march, which was made up of a variety of different groups.

20.     By all accounts, the March was a peaceful and joyful  endeavor until members of the NYPD attempted to arrest individuals for using graffiti.

21.     Prior to the NYPD's unjustified use of force, the marchers were cheering, listening a to a bus that was playing music, and generally having a enjoyable time while marching.

22.     In order to execute the arrest, dozens of NYPD officers rushed the crowd or protestors, cursed at them, used pepper spray against them, using tear gas, while violently shoving individuals to the ground.

23.     The actions by the NYPD were uniformly excessive and completely unjustified.  Consequently, these actions drew swift condemnation from non profit organizations, march organizers, and politicians.

24.     March organizer Jake Tolan of the Reclaim Pride Coalition said that "51 years after the Stonewall Rebellion, the NYPD is still responding to peaceful, powerful, righteous queer joy with pepper spray, batons, and handcuffs."

25.     New York City Council Speaker Corey Johnson said that , "The first pride started as a response to brutality. Today, peaceful protesters were pepper sprayed on the 51st anniversary of Stonewall. This is incredibly disturbing, We need a full investigation into what happened today.

26.     In addition GLAAD, the historic LGBT rights organization, said " On the anniversary of the start of the Stonewall riots, the NYPD is attacking LGBTQ people who are marching for Pride.  Let that sink in."

27.     As the NYPD Officers unnecessarily escalated the situation by their gratuitous use of violence, Plaintiff heard cries for assistance and requests by people for her to come over there.

28.     Plaintiff is a public defender in Kings County, and though she was not attending the March in her official capacity, her legal knowledge and expertise would be of assistance to the marchers.

29.     The initial cries consisted of people yelling, they're pepper spraying us!"

30.     Plaintiff went over to help.  She gave a girl who was crying a bottle of water to wash out her eyes.

31.     At this point, she observed numerous police officers pushing protestors back towards Washington Square North.

32.      While Whalen was standing there, she observed a commotion over a young man being arrested.  This young man was being dragged aggressively across the ground.

33.     Plaintiff attempted to find out this young man's name and birth date. This was in order to assist in finding out where he was going to be held and when he was being released.

34.     Eventually, Plaintiff walked away from the crowd and walked towards MacDougal Street, a quieter place near a police van.

35.     Plaintiff moved there in order ask the police officer why the young man was being arrested and find out his information.

36.     While Plaintiff was standing by the van with her bike, Officer Ruggiero with a baton in his hand, aggressively and violently pushed her to the ground.  This violent act was unnecessary, excessive, and  unjustified.

37.     The assault later caused outrage.  A NBC New reporter, after witnessing the attack, demanded the NYPD explain what prompted this unprovoked assault.



38.     This assault was witnesses by numerous other police officers, including supervisors.  They failed to intervene or attempt to stop Officer Ruggierio from committing the assault.

39.     Moreover, after the assault, no officer rendered aid to Plaintiff nor disciplined Officer Ruggierio.

**NYPD Systematically Used Excessive Force and Unlawful Detentions and Arrests to Suppress the Widespread Protests that Occurred After the Police Killings of George Floyd and Breonna Taylor**

42.     Ms. Whalen's experience was not unique. NYPD systematically used excessive force and unlawful detentions and arrests to suppress large-scale protests that occurred in the wake of the police killings of George Floyd and Breonna Taylor. The protests began on May 28, 2020 and continued on a near-daily basis in every borough of New York City for several months thereafter (the "Protests").

43.     Like the Stonewall Anniversary Protest, the vast majority of the Protests were peaceful: NYPD Commissioner Dermot F. Shea acknowledged that New Yorkers who attended the protests "overwhelmingly [] are good people coming out to voice their opinion." NYPD Chief Terence A. Monahan also admitted in a public statement that "the vast majority of people are out there to express their views."

44.     In response to these largely peaceful Protests, and like the Stonewall Anniversary Protest, NYPD officers repeatedly and without justification used batons, fist strikes, pepper spray, and other physical force, all of which constitute excessive force, against people peacefully protesting police brutality, continuing its custom, policy, or usage of suppressing peaceful protests with excessive force.

45.     The NYPD also effected mass arrests and detained protesters without cause or justification, continuing its custom, policy, or usage of suppressing peaceful protests with unlawful detentions and arrests.

46.     In July 2020, the New York State Attorney General (the "AG") issued a preliminary report on the NYPD's response to the Protests ("AG Report").[1]

47.     The AG Report found that most complaints received by the AG were allegations of excessive force— against protestors, the press, legal observers, elected officials, and essential workers—and unlawful arrests.

48.     The AG received more than 100 phone calls and over 1,200 written complaints about unlawful NYPD protest-related conduct during the first two months of the Protests.[2]

49.     "Most of the complaints [the AG] received were about allegations of NYPD officers using excessive force against protesters, including use of batons and indiscriminate use of pepper spray, brandishing firearms at protesters, and pushing vehicles or bikes into protesters."[3]

50.     "The []AG received complaints and heard extensive testimony at its public hearing about a tactic NYPD used whereby officers surrounded and blocked protesters, preventing them from leaving an area without making direct contact with police officers. According to witnesses, this practice often led to violent clashes between NYPD and protesters."[4]

---

[1] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd* (July 2020), https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf.

[2] *Id.* at 5.

[3] *Id.*

[4] *Id.*

51.     "The []AG received a significant number of complaints about troubling arrest-related practices, including, among others, using extremely tight zip ties to restrict hands, transporting protesters long distances to arrest processing centers, holding protesters for a significant amount of time after arrest, misgendering detainees, and holding protesters in cramped cells under unsafe conditions in light of the ongoing COVID-19 pandemic."[5]

52.     The NYC Department of Investigation made similar findings in a December 2020 report ("DOI Report").[6]

53.     The DOI Report concluded, inter alia, that "the force required to carry out a mass arrest was disproportionate to the identified threat, placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity."[7]

54.     The Report also found that between May 28 and June 20, the Civilian Complaint Review Board ("CCRB") received 1,646 protest-related complaint: "Force allegations comprised the largest number of allegations (1,052 in total)."[8]

55.     In September of 2020, Human Rights Watch issued a detailed analysis of a June 4, 2020 protest in the Mott Haven neighborhood of the Bronx ("HRW Report")[9].

---

[5] *Id.*

[6] New York City Department of Investigations, *Investigation into NYPD Response to the George Floyd Protests* (Dec. 2020), https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.

[7] *Id.* at 56.

[8] *Id.*

[9] Human Rights Watch, *"Kettling" Protesters In The Bronx: Systemic Police Brutality And Its Costs In The United States* (Sept. 2020), https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states.

The report described the preplanned and coordinated disruption of the march by the NYPD, including by Chief Monahan who was at the protest.

56.     The HRW Report describes the systematic "kettling" of protesters before the 8:00 p.m. curfew and NYPD's use of excessive force and mass arrest of protestors, as well as medical workers and legal observers, who were classified as essential workers exempt from the curfew.

57.     Numerous lawsuits, including one by the AG, have been filed challenging NYPD's use of excessive force and unlawful detentions and arrests during the Protests. *See, e.g., People of the State of New York v. City of New York, et al.*, 21-cv-0322, Doc. 51 (S.D.N.Y.) (First Amended Complaint).

58.     The AG's Complaint details NYPD's widespread use of excessive force against peaceful protestors during the Protests. For example:

a.   At a May 28 protest at Union Square, NYPD Officers repeatedly rammed their bicycles into peaceful protestors. *Id.* ¶¶ 128-132.

b.   At a May 29 protest in Clinton Hill, NYPD officers, without warning or provocation, repeatedly charged into a crowd of protestors and hit them with batons, causing at least one protestor to bleed profusely and sustain a concussion. *Id.* ¶¶ 133-138.

c.   On the same night, at a different protest in Bedford-Stuyvesant, Brooklyn, NYPD officers charged into a group of peaceful protestors gathered on a sidewalk, causing some to fall to the ground. As one protestor laid on the ground, a NYPD

officer swung a baton overhead and hit the protestor, causing a two-inch laceration on her forehead that bled profusely. *Id.* ¶¶ 141-146.

    d.  At a May 31 protest, on or around Broadway and East 11th Street in Manhattan, NYPD Officers in riot gear blocked the path of protestors and ordered them to disperse. Officers then charged into the crowd of protestors, striking them with their shields and batons. *Id.* ¶¶ 155-160.

    e.  At a June 4 protest in the Mott Haven Neighborhood of the Bronx:

> NYPD Officers, including at least one supervisor, sat on top of a parked car. Beneath them stood a large group of protesters who were barricaded in by NYPD Officers and prevented from exiting the area. The NYPD Officers perched on the car swung their batons at the heads of protesters standing below and dispersed pepper spray into the crowd. *Id.* ¶ 169.
>
> . . .
>
> During the Protests, NYPD Officers engaged in a pattern or practice of using pepper spray indiscriminately against protesters who were not posing a threat to any individual or actively resisting arrest. *Id.* ¶ 171.

59.    The AG's Complaint details numerous other instances of NYPD officers using excessive force during the Protests, including indiscriminate use of pepper spray; striking protestors with batons and other objects; and shoving, ramming, and charging at protestors.

60.    The AG's Complaint also details NYPD's widespread use of unlawful arrests during the Protests:

    a.   Throughout the Protests, NYPD officers wrongfully arrested individuals exempt from the Curfew Orders, including legal observers, medics, jail support providers and other essential workers. *Id.* ¶¶ 262-323.

    b.   At a June 3 protest in Midtown Manhattan, NYPD officers surrounded a group of peaceful protestors around East 54th and Third Avenue, and without warning charged into protesters from all sides and used excessive force while making unlawful arrests. *Id.* ¶¶ 347-354.

    c.   On June 4, in South Williamsburg, NYPD officers blocked the path of about 400 marching protesters. The Officers did not give protesters warning or a dispersal order before charging into the crowd, indiscriminately throwing protesters to the ground, beating them with batons, and arresting them. *Id.* ¶¶ 355-365.

    d.   At a June 4 protest in Mott Haven, NYPD Officers surrounded protestors such that they were not able to leave, brutalized, and unlawfully arrested over 250 individuals. *Id.* at 366-387.

61.   The DOI Report, AG Report, HRW Report, and lawsuits filed following the Protests document the NYPD's persisting policy and practice of violently suppressing peaceful protest with excessive force and unlawful arrests.

**The NYPD Has a History of Responding to Peaceful Protests with Excessive Force and Unlawful Arrests. Defendant City of New York has Failed to Train, Supervise, Discipline, and Otherwise Take Measures to Stop this Unlawful Conduct from Occurring**

62.     NYPD's response to the Protests was not unique. For at least the last two decades, the NYPD has engaged in the same unlawful policies and practice of using excessive force and unlawful arrests to suppress large-scale protests. This misconduct is widely documented in prior lawsuits, complaints, and reports.

63.     Following a 2003 anti-war protest, an investigation by the New York Civil Liberties Union (NYCLU) documented 198 accounts of excessive force by NYPD Officers, including the use of horses and batons to disperse crowds as well as indiscriminate pepper spraying. This investigation also documented the use of crowd control tactics such as physically preventing demonstrators from reaching their rally location, herding protesters into pens fashioned from metal barricades, and conducting mass arrests.[10]

64.     NYCLU documented similar unconstitutional practices at protests of the 2004 Republican National Convention ("RNC"). NYCLU received over 200 complaints from witnesses at the RNC protests and published a report finding that the NYPD "severely undermined" protesters' rights through "mass arrests of hundreds of peaceful demonstrators and bystanders" and "the pervasive surveillance" of lawful demonstrators.[11]

---

[10] N.Y. Civil Liberties Union, *Arresting Protest* (2003), https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.
[11]     N.Y.     Civil     Liberties     Union,     *Rights     and     Wrongs     at     the     RNC*     (2005), https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.

65.   The CCRB, an independent NYPD oversight agency, conducted its own investigation and made similar findings regarding the RNC protest in a published report. CCRB found that then-Deputy Chief Monahan and another deputy chief failed to make their orders to disperse sufficiently audible, understandable, or with enough time to allow protesters to leave before effecting arrests, resulting in the mass arrest of nearly 250 protesters.

66.   Following large-scale demonstrations in downtown Manhattan in 2011, known as the "Occupy Wall Street" protests, the Protest and Assembly Rights Project issued a 2012 report detailing 130 complaints of excessive or unnecessary force against protesters, bystanders, lawyers, legal observers, and journalists. These claims included over a dozen instances where officers interfered with independent monitoring by journalists and legal observers by threatening to or in fact arresting them, and the repeated use of kettling against peaceful protesters, which "inflamed tensions," "caused confusion and panic," and "chilled ongoing and future protest activity."[12]

67.   In October 2015, the NYPD Office of the Inspector General ("NYPD-OIG") issued a report assessing the NYPD's use of force. It found that (1) the NYPD's "use-of-force policy was vague and imprecise, providing little guidance to individual officers on what actions constitute force and providing insufficient instruction on de-escalation"; (2) the "NYPD's training programs did not adequately focus on de-escalation"; and (3)

---

[12] Protest & Assembly Rights Proj., *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street* (2012), https://cdn.theatlantic.com/static/mt/assets/politics/Suppressing%20Protest.pdf.

the "NYPD frequently failed to impose discipline even when provided with evidence of excessive force."

68.     Despite repeated notice about the NYPD's shortcomings in lawfully policing protests and the NYPD-OIG's own report on training deficiencies in connection with the use of force, the NYPD's recent conduct demonstrates that the City failed to correct these practices and adequately train its officers on constitutional policing during protests.

69.     This was confirmed by a December 2020 DOI Report[13], which found that prior to the Protests, the NYPD lacked standardized, agency-wide, in-service training related to policing protests.

70.     The DOI Report specifically found that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd control that led to excessive force and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.[14]

71.     Similarly, a December 2020 report by the NYC Corporation Counsel uncovered that the NYPD failed to conduct "any protest-related after action-review" between (at earliest) the 2004 RNC protests and the Protests.[15]

---

[13] *See supra* n.7.

[14] *Id.* at 36.

[15]     New     York     City     Law     Department,     Corporation     Counsel     Report     (Dec.     2020), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

72.     After release of the NYC-DOI and Corporate Counsel reports, the City admitted that it failed to train NYPD officers in policing protests and to otherwise correct and prevent their misconduct.

73.     In a December 18, 2020 video statement posted on social media, New York City Mayor Bill de Blasio acknowledged that he "agree[d] with [the NYC-DOI's] analysis" and with its recommendations. He confirmed that New York City Police Commissioner Dermot Shea also agreed. He further admitted that "there were things that happened that were not about whether someone made the individual mistake, there were choices made, strategic choices, that weren't good choices it turns out; that end up causing problems. And we have to come to grips with that. We have to train our police force differently."

74.     NYPD leadership also admitted that it failed to prepare NYPD Officers for the Protests. Now-retired NYPD Chief of Department Terence Monahan admitted after the Protests that "[a] lot of cops had not received disorder trainings since they first came on the job."

75.     This failure predictably led to constitutional violations. As NYPD Chief of Patrol Juanita Holmes stated in October 2020 about the Protests: "[i]f [the officers] [saw] something that they perceived to be a violation of the law, they arrested that person, not realizing that protests are allowed—that peaceful protests are allowed." She further admitted that "we had officers that did things that never should have been done; that's not in alignment with what we stand for as agency."

76. Upon information and belief, the City has not disciplined the vast majority NYPD Officers who engaged in misconduct during the Protests.

## INJURIES AND DAMAGES

77. This action seeks damages on behalf of Plaintiff for the, extraordinary emotional pain and suffering, and injuries to her person, that Plaintiff was forced to endure as a consequence of Defendants' decidedly wrongful actions.

78. The acts and omissions of Defendants entitle Plaintiff to compensatory and punitive damages.

## CLAIMS FOR RELIEF

### Claim I: Monell
*Against City of New York*

79. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

80. Under the principles of municipal liability for federal civil rights violations, the City of New York, and the NYPD or authorized delegates have final managerial responsibility for training, instructing, tracking, supervising, and disciplining officers regarding their conduct in their constitutional obligation to not permit excessive force to be used at peaceful protests.

81. The aforesaid deliberate or de facto policies, procedures, regulations, practices and/or customs, including the failure to properly instruct, train, supervise,

and/or discipline employees with regard thereto, were implemented or tolerated by policymaking officials for Defendant City, who knew:

a.      to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise during peaceful protests that occur in NYC generally and relating to George Floyd specifically;

b.      that such issues can be solved by having proper instruction, training, supervision, and discipline;

c.      that continuing to fail to address the search policies will frequently cause the deprivation of the constitutional rights of the protestors and Plaintiff; and

d.      that employees of the NYPD, have a documented history of using excessive force that were a violation of visitors New York State and Federal Constitution rights.

82.    The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph:

83.    During all times material to this complaint, the City and the NYPD, owed a duty to the public at large and to Plaintiff to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by subordinates that violate the constitutional rights of members of the public.

84.    However, the NYPD and its designees, as policymakers for the City, knowingly and intentionally breached, or were deliberately indifferent to, this duty.

## Claim II: Failure To Intervene Under 42 U.S.C. § 1983
### *Against Defendant Officer John Does 1 - 3*

85.    Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein.

86.   Those defendants that were present but did not actively participate in the aforementioned unlawful conduct, had a duty to intervene and prevent such conduct and failed to intervene.

87.   Accordingly, the defendants who failed to intervene violated the Fourth, Fifth, Sixth and Fourteenth Amendments.

88.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

### Claim III: Assault and Battery Under New York State Law
*Against Police Officer Anthony Ruggerio*

89.   Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

90.   That, on or about June 28, 2020, Officer Ruggierio, who were acting within the scope of their employment with the DEFENDANT, THE CITY OF NEW YORK, at the aforesaid location.

91.   That, on or about June 28, 2020, Officer Ruggierio committed an assault and battery knowingly, intentionally and willfully.

92.   That, on or about June 28, 2020 the individual DEFENDANTS who committed the aforementioned assault and battery upon the Plaintiff were acting within the scope of their employment with the Defendant, The City of New York.

93.   That on or about June 28, 2020 the assault and battery on the Plaintiff was without probable cause and was not the result of a lawful arrest.

94.    By reason of the foregoing, DEFENDANTS are liable to Plaintiff for damages.

### Claim IV: Excessive Force Under 42 U.S.C. § 1983
*Against Police Officer Anthony Ruggiero*

95.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

96.    In detaining plaintiff, Defendant John Doe used force.

97.    The force used was unreasonable and excessive.

98.    As a result of the unreasonable and excessive force, plaintiff suffered injuries requiring, physical rehabilitation, and substantial pain.

99.    Defendants' use of force was a substantial factor in causing the harm to plaintiff.

100.    As a result of the foregoing, plaintiff was caused to suffer physical, psychological and emotional injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, and loss of freedom.

### Claim V:  Prima Facie Tort Under New York State Law
*Against City of New York and Police Officer Ruggierio*

102.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

103.    Defendants intentionally inflicted harm, resulting in damages, without excuse or justification, by an act or series of acts, excusing the foregoing claims, that were otherwise lawful.

104.    As a direct and proximate result of this unlawful conduct, plaintiff

sustained the damages hereinbefore alleged.

### Claim VI: Negligent Supervision, Retention, and Training Under New York State Law
*Against Defendant City of New York*

105.    Plaintiffs realleges the preceding paragraphs as if set forth here.

106.    Defendant City of New York failed to use reasonable care in the training

and supervision of the NYPD Officers who, negligently injured, and violated the

constitutional rights of Plaintiff.

107.    As a direct and proximate result of Defendant's negligence, Plaintiffs

suffered serious bodily injury, emotional distress and mental anguish, costs, and

expenses, and was otherwise damaged and injured.

### Claim VII: Violations of the New York State Constitution
*Against Defendant City of New York and Police Officer Anthony Ruggierio*

108.    Plaintiff repeats and realleges each allegation contained in the preceding

paragraphs as if fully set forth herein.

109.    By virtue of the aforementioned acts, the Individual Defendants are liable

to Plaintiff for violating his right to due process under Article I § 6 of the New York State

Constitution, and her right to be free of unreasonable and unlawful searches and

seizures under Article I § 12 of the New York State Constitution.

110.    Defendant City of New York is liable for these violations of the New York

State Constitution under the principle of *respondeat superior*. subsequently, the

individual officers and the City of New York are liable to Plaintiff for compensatory and

punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE,** plaintiff demands the following relief jointly and severally against all of
the defendants:

      a.  Compensatory damages;

      b.  Punitive damages;

      c.  The convening and empaneling of a jury to consider the merits of the
claims herein;

      d.  Costs and interest and attorney's fees;

      e.  Such other and further relief as this court may deem appropriate and
equitable.

Dated:      New York, New York
February 17, 2022

                  Yours, etc.

                  LORD LAW GROUP PLLC

                  /s/ Masai I. Lord

                  Masai I. Lord
                  Attorney for Plaintiff
                  EMILY WHALEN
                  14 Wall St., Ste 1603
                  New York, NY 10005
                  718-701-1002
                  mlord@lordlawgroup.com